UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**DAVID VALENCIA,**

                 Petitioner,

v.

**JEFFREY BEARD,** *et al.,*

            Respondents.

)
)
)
)
)
)
)
)
)
)
)
)
)

Civil No. 16-CV-0101-DMS (WVG)

**REPORT AND RECOMMENDATION DENYING PETITON FOR WRIT OF HABEAS CORPUS AND DENYING REQUEST FOR CERTIFICATE OF APPEALABILITY**

**[DOC. NO. 1]**

## I.    **INTRODUCTION**

    On January 14, 2016, Petitioner David Valencia ("Petitioner"), a state prisoner proceeding pro se, filed a Petition for Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254, challenging his conviction for kidnapping for ransom of Cesar Uribe ("Uribe"), Cal. Penal Code[1] § 209(a), murder of Uribe, Cal. Penal Code § 187(a), simple kidnapping of Cesar Anthony Leon ("Leon"), Cal. Penal Code § 207(a), and murder of Leon, Cal. Penal Code §187(a).  (Doc. No. 1.)   Petitioner claims that his federal

---

[1]  All further references are to the California Penal Code, unless otherwise noted.

14-CV-2837

1
2
3
4
5
6
7

constitutional rights were violated because his counsel was ineffective for failing to assert a double jeopardy bar to his prosecution, and because there was no evidence corroborating the accomplice testimony asserted against him at trial. Id. On April 12, 2016, Respondents Jeffrey Beard and Kamala D. Harris ("Respondents") filed an Answer to the Petition ("Answer") and contemporaneously lodged relevant state court records. (Doc. Nos. 6–7.)  Petitioner's traverse, if any, was due to be filed by May 12, 2016.  (Doc. No. 3 at 2–3.)  Petitioner did not file a traverse.

8
9
10
11

This case is before the undersigned Magistrate Judge pursuant to S.D. Cal. Civ. R. 72.1(d)(4) for Proposed Findings of Fact and Recommendation for Disposition.  For the reasons discussed below, the Court recommends that the Petition be **DENIED** with prejudice.

12

## II.   FACTUAL BACKGROUND

13
14
15
16
17
18
19
20

This Court gives deference to state court findings of fact and presumes them to be correct unless Petitioner rebuts the presumption of correctness by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1); see also Parke v. Raley, 506 U.S. 20, 35-36 (1992) (holding that findings of fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness).  The following facts are substantially taken from the California Court of Appeal's unpublished opinion on Petitioner's direct appeal, affirming the judgment of the trial court.  (See Lodgment No. 10; Doc. No. 7-90 at 6–33.)

21
22

### A. BACKGROUND REGARDING THE LOS PALILLOS CARTEL

23
24
25
26
27

A cartel is an organization that controls criminal activity in a given geographic area.  Lieutenants work for associates, and cells work for lieutenants.  Members of cells are known as soldiers.  They are very poorly paid and perform the undesirable tasks.  Making money is the primary goal of a cartel.  A cartel obtains money by trafficking drugs, accepting payments from those who are involved in criminal activity, and kidnapping for ransom.

28

Around 1986, a cartel known as the Arellano-Felix Organization (the AFO, also known as the Tijuana Cartel), headed by Benjamin Arellano-Felix and his brother, Ramon,[2] took over the lucrative drug-trafficking "Tijuana corridor" by which drugs–cocaine, heroin, marijuana, and methamphetamine–are moved from Mexico into the United States.  The AFO had a business relationship with Colombian drug lords and controlled the supply routes from Colombia to the United States through the Tijuana corridor.  Benjamin was the leader of the AFO and made all of the command decisions.  Ramon was his enforcer and right-hand man who would intimidate rival drug traffickers and cultivate relationships with corrupt officials.  By the early 1990's, thousands of people worked for the AFO in various roles.  Benjamin was arrested in March 2002, and Ramon died in February 2002 in a shootout in Mexico.

Benjamin and Ramon's brothers, Javier Arellano-Felix and Eduardo Arellano-Felix, took over the leadership of the AFO cartel, and its violent activities increased both as a result of rivalries as other drug traffickers tried to take over supply routes in the Tijuana corridor, and as a result of using other methods for obtaining money.  The cartel started committing other crimes, such as kidnapping for ransom and extortion.  When Javier was arrested in Mexico in August 2006, the leadership of the AFO was transferred to the Arellano-Felix brothers' nephew, Fernando Sanchez-Arellano.

Victor Rojas-Lopez, whose nickname was "El Palillo" (which means "the toothpick") was the leader of an AFO cell in Tijuana.  The cell called itself Los Palillos.  Another AFO cell was run by Javier's brother-in-law, Jorge Briseno-Lopez (nicknamed "Cholo").

In 2002, Cholo and one of Victor's subordinates in the Los Palillos cell got into an argument in a bar over a girl, which caused friction between the two AFO cells.  Victor intervened in the argument.  As a consequence of the argument, the AFO ordered the murder of Victor.

---

[2] The California Court of Appeal "sometimes refer[ed] to individuals involved in this case by their first names solely for the sake of clarity."  (Doc. No. 7-94 at 7, n. 4.)

16-CV-0101

After Victor's murder in late 2002, his brother, Jorge Rojas-Lopez, who was a member of Victor's Los Palillos cell, fled Tijuana, and he and the cell split from the AFO and relocated to San Diego. The cell kept its name, Los Palillos.

Los Palillos was connected to kidnappings and homicides committed in San Diego between 2004 and 2007, including a triple murder in August 2004, the murder of a man nicknamed "Camaron" in August 2005, and the kidnapping of Abelino Inzunza-Uriarte on April 13, 2006. The victims of the triple murder were drug traffickers working for the AFO. They were lured to a home, where they were killed and their money and drugs were stolen. The victims' bodies were left in a vehicle that was driven from the home and parked on a residential street in Chula Vista. Warning signs to the AFO were written in the dust on the vehicle.

In June 2007, the members of Los Palillos included Jorge Rojas-Lopez (nicknamed "Palillo" or "Jorgillo"); Guillermo Moreno-Garcia ("Memo"); his half-brother, Carlos Pena ("Morro"); Jesus Gonzalez Trujillo; Juan Francisco Estrada-Gonzalez; Jose Carlos Rangel Hernandez; Jesus Lopez-Becerra; his brother, Gerardo Gabriel Lopez-Becerra; Jorge Moreno; Juan Laureano-Arvizu ("Chaquetin"); Ernesto Ayon; Juan Frausto-Lopez; Ponciano Lopez-Frausto; Pedro Corrales; Eduardo Monroy ("El Arquitecto"); Nancy Michelle Mendoza-Moreno; [Petitioner's co-defendant] Jose Olivera-Beritan ("Chino" or "Asere"); and Petitioner. Many of the members also used aliases, including Beritan, whose aliases were Onel Jimenez and William Smith. Beritan was born in Havana, Cuba.

## B. PROPERTIES CONNECTED TO LOS PALILLOS

### 1. GARBER AVENUE SAFE HOUSE

In 2006, Emmanuel Nwagbo owned a two-story, five-bedroom residence located on Garber Avenue in the Paradise Hills area of San Diego. Nwagbo testified that on October 16 of that year, a man named Ignacio Peredo, and a woman named Norma Berumen, signed a one-year agreement to rent the property. Berumen was with two children and another man that she said was her husband.

4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

In December 2006, Berumen told Nwagbo that Peredo was her brother.  Suspicious about who was living in the residence, Nwagbo went there and met Peredo.  However, Nwagbo was not allowed inside the house.  The rent was paid regularly until January 2007, when the payments stopped.  Nwagbo called Peredo, who sent by overnight mail a rent payment in the form of a money order for April and May 2007.  The package was from a UPS store and the return address was in the name of Onel Jimenez (Beritan's alias).

### 2.  POINT DUME COURT SAFE HOUSE

On May 26, 2007, a real estate agent rented a residence located on Point Dume Court in Chula Vista to a Mexican citizen named Luis Armando Gonzalez-Perez.  The agent knew Petitioner, having rented a different home in Eastlake to him on an earlier occasion.[3]

### 3.  HORSE RANCH

In 2007, Gilberto Corral owned a 15-acre horse ranch in Imperial Beach less than 10 miles from the border.  Corral leased some stables to Fabian Gonzalez, and Gonzalez subleased stables to others, including Petitioner, Uribe, and Gonzalez's brother, Adrian.  Ernesto Ayon slept at the property Gonzalez rented from Corral and helped clean and feed the horses.

In May 2007, Gonzalez owned a Caterpillar Bobcat machine that he kept at the horse ranch and used to clean stables, level the ground, and move heavy items.  Gonzalez allowed Ayon to drive the Bobcat to clean the stables.

---

[3] This Court recognizes that it appears as if some connecting information is missing from this paragraph, however, this is taken verbatim from the California Court of Appeal's opinion on Petitioner's direct appeal.

16-CV-0101

## C. <u>KIDNAPPINGS AND MURDERS OF URIBE AND LEON</u>

### 1. <u>URIBE[4] (COUNTS 4 & 5 CHARGED AGAINST BOTH PETITIONER AND CO-DEFENDANT BERITAN)</u>

In May 2007, Uribe was a marijuana trafficker who lived with his wife, Veronica Gamez, in Eastlake.  Like Leon, Uribe disappeared on May 3, 2007.

Before his disappearance, Uribe had a drug-trafficking business relationship with his close friend, Antonio Sanchez-Salas, who used an alias-Roberto Palafax–because he was in the United States illegally. Uribe would obtain marijuana, and Palafax would take it to Cleveland and sell it to their clients, who were other drug dealers.

Uribe and Gamez met Petitioner in late 1999.  They all became close friends.  Petitioner and his brother joined Uribe in the marijuana–trafficking business.  However, the business relationship ended in 2004, and Uribe started working with Palafax as his partner.

Gamez testified that Petitioner and Uribe remained friends for awhile, and they both moved to Eastlake.  However, their friendship ended in March 2007 due to a quarrel over drug trafficking.

Petitioner rented his home from Fabian Gonzalez's brother, Adrian.  Petitioner's monthly rent was about $4,500, and he frequently was behind on his rent.

Adrian testified that in May 2007, Petitioner was two months behind on his rent, and he (Adrian) tried to collect the $9,000 owed from him.  Petitioner told Adrian that Uribe owed him $70,000, and he (Petitioner) would pay the rent when he received the money from Uribe.

On May 3, 2007, shortly before 8:30 a.m., Adrian telephoned Uribe while Uribe was about to leave the house with Leon.  Adrian

---

[4] Count Four, kidnapping for ransom of Uribe in violation of Section 209(a), and Count Five, first degree murder of Uribe in violation of Section 187(a), were charged against both Petitioner and Beritan.  (Lodgment 10; Doc. No. 7-90 at 2-3.)

16-CV-0101

asked Uribe whether he owed Petitioner money.  Uribe became very angry, cursed, denied that he owed money to Petitioner, said that Petitioner was lying, and told Adrian he did not know what Adrian was talking about.

Petitioner then called Uribe, also before Uribe and Leon left the house that morning, and told Uribe they needed to talk.  Uribe told Petitioner he was on his way out and would call back as soon as he was in the car.  Uribe, accompanied by Leon, then left the house for the last time.

Later that day, Palafax, who was in Cleveland, received a call from a man he did not know and learned that Uribe had been abducted. Palafax testified that the man called from Uribe's Nextel phone using the "push to talk" feature.  The man told Palafax, in Spanish, that they knew he was on the East Coast, they had his friend (Uribe) and nothing was going to happen, but it was "not a game" and they would call him again in 30 minutes with instructions.  The man called back and demanded half a million dollars.  When Palafax told the man "We ain't got that kind of money," the man told Palafax he knew everything about Palafax and his family, and then threatened to kill Uribe if Palafax called the police.  When Palafax asked the man about Leon, he said they also had the "stupid homey" with them.

Palafax called Uribe's wife, Gamez, to let her know what was going on.  Palafax flew to San Diego.

Palafax, Gamez, and Uribe's family began raising money to secure Uribe's release.  Eventually, they raised about $50,000.  On May 10, the man who had spoken to Palafax called him again to arrange the ransom drop.  The ransom money was delivered to two armed men at the Briarwood apartment complex.

Later, one of the kidnappers called Palafax again and told him that $50,000 was a "joke" and they would give him a week to come up with more money.  Uribe's brother-in-law agreed to do the second ransom drop.  Following instructions, he delivered the ransom money to a specified location in National City.  No one ever heard from Uribe again.  On May 24, 2007, Uribe's family called the police.

### 2. LEON[5] (COUNTS 6 & 7, CHARGED AGAINST BOTH PETITIONER AND CO-DEFENDANT BERITAN)

In May 2007, Leon lived with his mother in Santee. Uribe was a friend of Leon's. On May 3, 2007, when Leon's mother returned from work at 5:00 p.m., Leon was gone and he never returned home. No one called Leon's family with a ransom demand.

### D. KIDNAPPING OF TOSTADO[6] (COUNTS 8 & 9, CHARGED AGAINST CO-DEFENDANT BERITAN ONLY)

In May 2007, Eduardo Gonzalez-Tostado, a wealthy Mexican-born businessman, was living with his wife and daughter in Chula Vista. Tostado testified that his residence was in a gated community that required entry of a code in order to gain access. When Tostado and his family moved in around May 2005, he had some remodeling work done to the home. Los Palillos member Eduardo Monroy ("El Arquitecto") did the work. Tostado gave Monroy the gate access code to allow him to do the work.

Tostado testified that he and Petitioner had been friends. However, Tostado had a falling out with Petitioner in 2003 or 2004, and they no longer communicated with one another.

One evening in May 2007, when Tostado returned home from work, he found a note in Spanish on his doorstep with a name and a phone number. The note said to call "Roberto" regarding an urgent matter. Although Tostado did not know the man, Tostado's cousin, Sergio Tostado, recognized him as Arvizu ("Chaquetin"), who was a Los Palillos member.

---

[5] Count Six, simple kidnapping in violation of Section 207(a), and Count 7, first degree murder of Leon in violation of Section 187(a), were charged against both Petitioner and Beritan. (Lodgment 10; Doc. No. 7-90 at 3.)

[6] Count 8, conspiracy to commit kidnapping for ransom in violation of Section 182(a)(1) and 209(a), and Count Nine, kidnap for ransom in violation of Section 209(a), were charged against Beritan only. (Lodgment 10; Doc. No. 7-90 at 3.)

16-CV-0101

Afraid he might be the potential victim of a kidnapping, Tostado told his wife to contact the FBI if anything happened to him. Tostado called the number written on the piece of paper, a man (Arvizu) answered the phone, and identified himself as Roberto. Tostado asked Arvizu to describe the nature of the urgent matter. Arvizu said he needed to talk to Tostado in person because "they" were trying to kidnap him (Tostado). Tostado asked Arvizu who he meant by "they," and Arvizu responded that a dangerous "group of people" were going to do it. Arvizu told Tostado that if he gave Arvizu $50,000, Arvizu would let him know who "they" were. Arvizu asked Tostado to meet him in a public place and bring cash, and Tostado told Arvizu he would call him back.

Tostado called Arvizu later from his restaurant in Tijuana. Tostado told Arvizu he knew his name was "Chaquetin" and offered him $5,000 if he would come to the restaurant and provide him with the information. During the conversation, Arvizu told him that Monroy had given the kidnappers the gate access code to Tostado's home.

Around the same time period, a mutual friend of Tostado and Petitioner's told Tostado that Petitioner was trying to reach him (Tostado). Tostado used the friend's phone to call Petitioner, and they agreed to meet for coffee. While the two had coffee together, Petitioner told Tostado he needed to buy a pickup truck and a car and gave Tostado a cashier's check for $40,000.

In early June 2007, Petitioner and Tostado went to look at cars, and Tostado purchased two vehicles at an auction the next day. Petitioner made arrangements to meet in a couple of days with Tostado at a Starbucks in Chula Vista to pay the balance he owed on the vehicles and arrange for their delivery.

On June 8, 2007, when Tostado and Petitioner met at the Starbucks, Petitioner said he was expecting a friend who wanted to sell Tostado a nice BMW. That person never arrived. Instead, an attractive Mexican woman came to the table and talked to Petitioner in Spanish. Petitioner introduced her as his friend, Nancy. Shortly thereafter, Nancy spoke with Petitioner again and left.

16-CV-0101

As Nancy drove away, she telephoned Petitioner.  Petitioner then told Tostado that Nancy liked him and wanted to go out with him for drinks.  Tostado called Nancy and made plans to pick her up at a coffee shop.  When he got there, Nancy was waiting outside.  She told him she wanted to go to a certain bar in Tijuana.  Nancy asked Tostado to follow her in his car.

Tostado testified that he followed Nancy to a house (the Point Dume Court safe house) at the end of a street in a cul-de-sac.  Nancy went inside the house and told Tostado when she returned that her aunt was not home, and they could have drinks in the house.  Tostado agreed.  He told her he had to leave, but would return in a few minutes.  When he returned, Nancy let him in.

All of a sudden, three men wearing ski masks and police gear ran towards Tostado from the hall.  They were armed with rifles.  Two of the men grabbed Tostado and the third struck him in the face and stomach with a rifle.  Tostado felt a lot of Taser strikes on his back, and he fell to the floor.  The men continued to kick and hit him, and he passed out.

Tostado testified that when he regained consciousness, he was face down with his legs and hands cuffed behind him and someone sitting on his back.  Tostado, who was blindfolded, heard Nancy say she was leaving.  Another man told her to take Tostado's car.

Tostado testified the three kidnappers referred to themselves as Boss 1, Boss 2, and Boss 3.  Boss 1 did most of the talking.  Boss 1 told Tostado not to do anything stupid, they wanted money, and then they would let him go.  He asked Tostado for $2 or $3 million dollars.  Tostado said he did not have that much money, and Boss 1 responded that he had investigated Tostado, looked at his home and his businesses, and knew he could come up with the money.  Boss 1 added that the "Architect" (Monroy) had given them the gate access code to Tostado's home.

Boss 1 told Tostado they had kidnapped Kilino (Vasquez, the brother-in-law of a high-ranking AFO member) and indicated they had killed Junior (Lozano).  Boss 1 said that if Tostado came up with $1

10

million, "they would let him go."  Boss 1 added that he was angry with
the AFO because they killed his brother, El Palillo.  He accused Tostado
of being friends with the AFO.  Tostado told Boss I that he (Tostado)
had nothing to do with his brother.

Tostado indicated at trial that he learned the nicknames of three of
the kidnappers.  Tio (Raul Rojas-Gamez) was the cook who told him
not to "do anything stupid" or they would kill him.  Morro (Pena) and
Asere (Beritan) were in charge of the house and were responsible for
guarding Tostado.  Pena guarded Tostado during the day and Beritan
guarded him at night.

Tostado also testified that Beritan had a Cuban accent and was
constantly using his laptop computer.  Beritan told Tostado he had been
a truck driver in Cuba before he moved to Miami, Florida.  Beritan also
told Tostado he had been driving a Chevy Equinox and conducting
surveillance outside Tostado's house at the time of Tostado's
kidnapping.

Tostado testified he expressed concern about his safety, noting he
had seen Nancy's face.  Tostado promised Beritan that if they let him
go, he would not identify her.  Beritan responded by telling Tostado
they had taken Kilino (Vasquez), who had been there for a month, had
paid the ransom, and had been released.  Beritan assured Tostado he
would have "no problem" because Vasquez was not killed even though
he, too, had seen Nancy.

FBI Special Agent Lauren Wood testified that, during her
investigation, she was able to identify Boss 1 as Jorge Rojas-Lopez
(Rojas).  A complex, multiagency operation was set up to track and
apprehend the kidnappers.

By June 15, $193,000 in ransom money had been raised.  That day,
one of the kidnappers called Tostado's cousin, Sergio, and told him to
await further instructions.  Also that same day, Sergio took the money
to the FBI office, where some of the bills were marked and
photographed, and they were all placed in a briefcase containing a
tracking device.  Wiretap warrants were obtained.

11

16-CV-0101

Tostado's wife notified Agent Wood that a ransom drop was planned for June 16.  In the afternoon on June 16, Agent Wood and two other agents met with Tostado's wife and Sergio, and the agents gave Sergio the briefcase containing the marked money and told him to follow the kidnapper's instructions.  While Sergio was with the agents, one of the kidnappers contacted him and gave him instructions about the ransom drop.

Law enforcement agents had placed a digital body recorder on Sergio so they could listen to anything he heard or said, including anything said during calls from the kidnappers, and thereby follow him during the ransom drop, but the audio did not work and they lost his trail.  Using the beacon signal in the briefcase of money, agents tracked the briefcase to a Mitsubishi Lancer with Baja license plates.  Through surveillance, the police determined that the Lancer was being driven by a lone Hispanic male, who picked up a second man.  The men, later identified as Juan Estrada-Gonzalez (Estrada) (who was the driver) and Rojas, drove to the Point Dume Court safe house and entered the residence.

Rojas and Estrada were arrested as they drove the Lancer away from the Point Dume Court residence.  The briefcase with the ransom money was in the car.  Tio (Raul Rojas-Gamez) was arrested driving away in a separate vehicle.

After awhile, agents outside the house announced their presence. Pena ran outside. Tostado testified that Beritan removed Tostado's blindfold and handcuffs, put one of the handcuffs on himself, and placed the blindfold around his head to cover his eyes.  Tostado opened the front door and walked outside.

Beritan came out of the Point Dume Court safe house and pretended to be a victim.  Tostado informed the agents that Beritan was one of the kidnappers, not a victim.  Beritan was arrested.  Pena was found hiding in a canyon and was also arrested.

At trial, Tostado identified Beritan as Asere and Pena as Morro.

12

## E. <u>INVESTIGATION</u>

During the investigation, Tostado was able to identify Boss 1 and Boss 2 by their voices.  Boss 1 was Rojas and Boss 2 was Estrada.

Utilities for the Point Dume Court residence were in the name of Oswaldo Barrera, an alias for Gerardo Lopez-Becerra.  A Chevrolet Equinox was in the garage, and Pena's Ford Ranger was parked near the house.  A receipt for caustic soda dated May 20 was in the truck.

A search was conducted inside the Point Dume Court residence. Bags of caustic soda were found under the kitchen sink.  A couple of boxes of muriatic acid were found in the home.  Officers also found several weapons, including AK-47-style rifles, a semiautomatic handgun, and a Taser.  Also found were police vests and gear, including a ballistic vest and hats with the words "police" and "FBI" on them.

A black computer-type carrying case or bag and a Sony laptop were found in the house.  The contents of the laptop bag included (1) several items indicating the bag belonged to Beritan, including an immigration document in the name of "Jose Leonel Beritan-Olivera" from Cuba, a photocopy of the front of a Social Security card in the name of "Jose Leonel Beritan-Olivera," and a photocopy of a Florida driver's license in the name of Jose L. Beritan; and (2) a small blue address book containing Tostado's personal information and credit card numbers.

In October 2009, based on information provided by Pena, a law enforcement team went to the horse ranch with a search warrant.  They found the liquefied remains of Leon and Uribe buried in the ground in barrels.

16-CV-0101

## F. <u>ACCOMPLICE TESTIMONY</u>[7]

### 1. <u>ACCOMPLICE TESTIMONY OF GUILLERMO MORENA-GARCIA ("MORENO")</u>

In August 2008, Moreno entered into a cooperation agreement with the district attorney's office under which he would provide information regarding several homicides, kidnappings, and robberies committed by members of Los Palillos.  Moreno agreed to testify truthfully in several Los Palillos cases, including the case against Petitioner and Beritan, in return for a prison sentence of between 25 years and 33 years eight months, to be determined by the court.

Moreno testified he had worked in Tijuana for Victor Rojas-Lopez (El Palillo), who (as already noted) was the leader of an AFO cell in Tijuana.  After Victor was murdered, Moreno started selling drugs for Victor's brother, Jorge Rojas-Lopez, who wanted to "get revenge" by targeting AFO members for murdering his brother.

Moreno indicated that Los Palillos rented safe houses in the San Diego area to facilitate the crimes they planned to commit against AFO members.  Specifically, Los Palillos rented the Garber Avenue and Point Dume Court residences as safe houses.

Moreno testified he was living alone in the Briarwood apartment complex when Beritan moved to San Diego.  Beritan moved into the Garber Avenue safe house, as did Moreno's brother, Pena.

Moreno also testified he had seen a false Florida identification card that Beritan used.  The card had a photograph of Beritan, but the name on the card was Onel Jimenez.

---

[7]  In its factual summary, the California Court of Appeal stated, "As the following accomplice testimony is primarily relevant to Beritan's claim that his convictions of [C]ounts 1 and 3 through 7 are not supported by sufficient corroborative evidence, our summary of the testimony is brief and primarily focused on the portions of the testimony that pertain to Beritan's role in the commission of the various crimes involved in this case." (Lodgment 10; Doc. No. 7-90 at 25, n. 6.)

Moreno spoke to Beritan and a few other members of Los Palillos about making money by kidnapping AFO members for ransom. Moreno testified that Beritan had participated in a kidnapping for ransom before he moved to San Diego, and Beritan expressed interest in making money this way.  Thereafter, Los Palillos started kidnapping AFO members for ransom.

Regarding the kidnapping and murder of Uribe and Leon, Moreno testified that Petitioner lured the victims to the Garber Avenue safe house on the pretext that Petitioner would bring someone there who would sell some marijuana.  After they arrived at the house, Uribe and Leon were abducted, handcuffed and blindfolded, and held captive upstairs.  Beritan, who was still living at the Garber Avenue safe house, helped to guard them during their captivity there.

Beritan was present when Uribe and Leon were murdered.  Jesus Gonzalez-Trujillo first murdered Leon by strangling him as he was being kicked.  Some of the Los Palillos members in the house dragged Leon's naked body over to a 55-gallon metal barrel containing muriatic acid and put the body head first into it.  Later, Uribe was strangled to death as he was being kicked.  His body was put head first into a second barrel containing muriatic acid.

Moreno testified that Beritan was present when the barrels were loaded on Pena's Ford Ranger truck.  The barrels were driven to the horse ranch where they were "dumped."  Moreno later had a falling out with Los Palillos and separated from the group.

Moreno testified that he was not involved in Tostado's kidnapping, and he never went to the Point Dume Court safe house.

## 2.  **ACCOMPLICE TESTIMONY OF CARLOS PENA**

In late 2010, Pena, Moreno's brother, entered into a cooperation agreement with the district attorney's office whereby he agreed to give truthful testimony in return for use immunity and a sentence ranging from 26 years eight months to 39 years eight months.

16-CV-0101

Pena testified that he joined Los Palillos in 2006. Los Palillos rented safe houses, and he would hang out in them with the other members of Los Palillos. Los Palillos rented the Garber Avenue safe house in October 2006, and Pena lived there with Beritan from that time until Los Palillos abandoned that safe house.

Pena's accomplice testimony was generally consistent with Moreno's regarding the kidnapping of Balitas, the kidnapping of Vasquez, the attempted kidnapping of Martinez, the murder of Lozano, and the kidnapping and murders of Uribe and Leon.

Pena provided some missing details regarding the Uribe/Leon murders and explained his own role in the crimes. As pertinent here, Pena testified that while the victims were held captive at the Garber Avenue safe house, he, Beritan, Moreno, and another Los Palillos member took turns guarding them. Beritan usually guarded them at night. During that time, both Pena and Beritan lived at the Garber Avenue safe house.

Pena also testified that he and Beritan bought masks to protect against fumes that would be coming from the barrels, and they also purchased fans, large plastic trash bags to cover the openings of the lidless barrels, and charcoal for the barbeque. Beritan and Petitioner were present when Uribe was strangled. Pena drove the barrels containing Leon's and Uribe's remains to the horse ranch in the bed of his truck. Pena backed his truck up to a hole in the ground that was five to seven feet deep, and a Bobcat machine was used to take the barrels out of the truck. The last time Pena saw the barrels they were on the Bobcat.

Pena also testified that later, a week after he drove the barrels to the ranch, he and Beritan cleaned up the Garber Avenue safe house and washed the downstairs floor with a disinfectant.

Pena testified he learned in June 2007 that Los Palillos had a new safe house–the Point Dume Court safe house. That month he moved into the new safe house. He also learned about Los Palillos's plans to kidnap Tostado.

16-CV-0101

On June 8, 2007, the day Tostado was kidnapped, Pena drove up and down the street acting as a lookout. While he was driving around as a lookout, Pena kept in phone contact with Beritan.

Pena testified that while Tostado was held captive at the Point Dume Court safe house, he (Pena), Beritan, and another member of Los Palillos guarded Tostado. On June 16, the FBI raided the Point Dume Court safe house and arrested Pena. Pena testified that Beritan took the "bands" off Tostado and put them on himself. Beritan's Equinox was parked in the garage at the time of the raid.

## III.   PROCEDURAL BACKGROUND

### A. GUILTY PLEA – TOSTADO CRIMES

On June 15, 2009, before he was indicted on the Uribe/Leon crimes in August 2009, Petitioner pled guilty in People v. Valencia (Super. Ct. San Diego County, 2009, No. SCD207302) to aiding and abetting the kidnapping for ransom of Tostado on June 8, 2007.[8]  (Doc. No. 1 at 30.)  In the plea agreement, Petitioner also admitted that he committed the offense against Tostado in furtherance of the Los Palillos street gang. (Doc. No. 1 at 30.)  Cal. Penal Code §§§ 182(a)(1); 209(a); 186.22(b)(1).  Pursuant to the plea agreement, Petitioner was sentenced to 15 years in state prison.  (Doc. No. 1 at 30.)

### B. CHARGES – URIBE AND LEON CRIMES

On August 6, 2009, a San Diego County grand jury issued an indictment against Petitioner and co-defendant Beritan.[9]  (Lodgment 3; 1 CT 1-36.)  Pertinent to the claims

[8] Petitioner's plea agreement can be found at 4 C.T. 832–834.

[9] Following a grand jury proceeding, the prosecution originally filed a 22-count indictment involving Petitioner, Beritan, and several additional defendants, along with several additional murder and kidnapping charges. (1 C.T. 4–36.) Pursuant to the prosecution's request, the trial court severed the defendants into three trial groups, with Petitioner and Beritan comprising Trial Group C. (See 1 C.T. 215–218; 11 R.T. 353–354.) Thereafter, the original counts in the indictment pertaining to Petitioner and Beritan were renumbered and included within an amended information that was deemed

here, Petitioner and Beritan were charged with the kidnapping for ransom and murder of Uribe (Counts Four and Five), and the kidnapping for ransom and murder of Leon (Counts Six and Seven).[10] (1 CT 1–36.)  The kidnapping counts were alleged to have occurred on and between May 3, 2007 and June 6, 2007, and the murder counts were alleged to have occurred on and between May 12, 2007 and June 6, 2007.  (Lodgment 3; Doc. No. 7-78 at 44–45, 47–48.)

Beritan was also charged with the following crimes: Count One, attempted kidnapping of Arturo Martinez-Barrera in violation of Sections 664/207(a); Count Two, robbery of Ivan Lozano-Valdez in violation of Section 211; Count Three, murder of Ivan Lozano-Valdez in violation of Section 187(a); Count Eight, conspiracy to kidnap Tostado for ransom in violation of Section 182 (a)(l); and Count Nine, kidnap of Tostado for ransom in violation of Section 209(a).[11]  (4 C.T. 869–871, 874–877.)  Pertinent to

_____

filed by stipulation. (See 4 C.T. 869–877; 6 C.T. 1491; 60 R.T. 13473–13475; 61 R.T. 14018–14019, 14026.)

[10] It was further alleged as special circumstances to Counts Five and Seven that the murders of Uribe and Leon were committed while Petitioner and Beritan were engaged in a kidnapping within the meaning of Section 190.2(a)(17)(B), that the murders involved the infliction of torture within the meaning of Section 190.2(a)(18), that the murders were committed while Petitioner and Beritan were actively participating in a criminal street gang within the meaning of Section 190.2(a)(22), and that Petitioner and Beritan committed multiple murders within the meaning of Section 190.2(a)(3).  (4 C.T. 872-874.)  It was further alleged as to Counts Four and Six that the kidnapping victims suffered bodily harm and death within the meaning of Section 209(a).  (4 C.T. 871, 873.)  Finally, it was further alleged as to each of Counts Four through Seven that the offenses were committed for the benefit of, and in association with, a criminal street gang within the meaning of Section 186.22(b)(l).  (4 C.T. 871-873.)

[11] As to Beritan, it was further alleged as special circumstances to Count Three that the murder involved kidnapping, robbery, torture, and gang participation, and that he was guilty of multiple murders.  (4 C.T. 870–871, 874.)  It was further alleged as to Count One that a principal used and discharged a firearm causing great bodily injury, further

18

the claims here, Count Eight, conspiracy to kidnap Tostado for ransom, was alleged to have occurred on and between May 1, 2007 and June 16, 2007, and Count Nine, kidnap Tostado for ransom, was alleged to have occurred on and between June 8, 2007 and June 16, 2007.  (4 C.T. pp. 869–877.)

## C. <u>JURY TRIAL – URIBE AND LEON CRIMES</u>

On May 15, 2012, a jury found Petitioner and Beritan guilty of the kidnapping and murder charges related to Uribe and Leon.  (Lodgment 1; 67 RT 15303–21; 4 CT 1074–1087, 1093–1122.01; 6 CT 1570–1571.)  The court sentenced Petitioner to consecutive terms of life without the possibility of parole for each of the murder counts, Counts Five and Seven.  Petitioner's sentence was stayed on the kidnapping counts, Counts Four and Six.  (70 RT 15371–74; 5 CT 1280–84; 6 CT 1570–71; <u>see</u> <u>also</u> 4 C.T. 832–834 [Petitioner's prior written plea agreement].)  The court also imposed a base term of 15 years for Petitioner's prior guilty plea to the Tostado kidnapping for ransom, the plea that was negotiated and obtained prior to Petitioner's indictment on the Uribe/Leon charges.

The jury also found Beritan guilty of the charges related to Tostado.  (Lodgment 10; Doc. No. 7-90 at 3.)  The court sentenced Beritan to a total state prison term of five consecutive terms of life without the possibility of parole, plus a consecutive term of 25 years to life, plus a consecutive term of 19 years.  (Lodgment 10; Doc. No. 7-90 at 4.)

As to Petitioner, the jury further found true the gang and multiple murder special circumstance allegations for Counts Five and Seven, found not true the kidnapping and torture special circumstance allegations for Counts Five and Seven, found true the

alleged as to Counts Eight and Nine that a principal used a firearm, further alleged as to Count Nine that the victim suffered bodily harm, and further alleged as to each of Counts One, Two, Three, Eight, and Nine that the offenses were committed for the benefit of, and in association with, a criminal street gang.  (4 C.T. 869–870, 874–877.)

16-CV-0101

infliction of bodily harm allegation for Count Four, and found true the gang enhancement allegations for each count.[12]  (5 C.T. 1074–1087.)

### D. PROCEEDINGS IN THE CALIFORNIA COURT OF APPEAL

#### 1. PETITIONER'S DIRECT APPEAL

##### a. DOUBLE JEOPARDY AND INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

On May 29, 2013, Petitioner appealed his conviction for the Uribe/Leon crimes to the California Court of Appeal.[13]  (Lodgment 4; Doc. No. 7-84.)  Petitioner claimed that his convictions for the kidnapping and murders of Uribe and Leon must be reversed because his prosecution violated the prohibition of multiple prosecutions under Section 654 and Kellett v. Superior Court, 63 Cal.2d 822 (1966) (Kellett).  He claimed that his prosecution was barred because he pled guilty to the kidnapping of Tostado before he was indicted on the Uribe/Leon crimes, and those crimes were all part of the same course of conduct.  (Lodgment 10; Doc. No. 7-90 at 33.)  Additionally, Petitioner asserted that his trial counsel provided ineffective assistance because he failed to argue that

---

[12] The jury found co-defendant Beritan guilty of attempted kidnapping in Count One, not guilty in Count Two, guilty of first degree murder in Counts Three, Five and Seven, guilty of kidnapping for ransom in Count Four, guilty of simple kidnapping in Count Six, guilty of conspiracy to commit kidnapping for ransom in Count Eight, and guilty of kidnapping for ransom in Count Nine.  The jury further found true the gang, kidnap, and multiple murder special circumstance allegations as to Counts Three, Five, and Seven, found not true the torture special circumstance allegations as to Counts Three, Five and Seven, found not true the robbery special circumstance allegation as to Count Three, found true the firearm allegations as to Counts One, Eight, and Nine, found true the infliction of bodily harm allegations as to Counts Four and Nine, and found true the gang enhancement allegations as to each count of conviction.  (5 C.T. 1093–1122.)

[13] On direct appeal, Petitioner argued that his abstract of judgment should be modified to correct several errors.  (Lodgment 4; Doc. No. 7-84 at 39.)

Petitioner's prosecution for the Uribe/Leon crimes was barred.  (Lodgment 10; Doc. No. 7-90 at 33–34.)

### b. JOINDER IN BERITAN'S ARGUMENTS ON DIRECT APPEAL

Petitioner noted that he joined in all arguments that Beritan might raise in his future appeal, provided that Beritan's arguments benefited Petitioner and were not inconsistent with other arguments raised by Petitioner.  (Lodgment 4; Doc. No. 7-84 at 43.)  At that time, Beritan had not yet filed a direct appeal.

### 2. PETITIONER'S STATE HABEAS PETITION

On June 12, 2013, two weeks after filing his direct appeal, Petitioner filed a petition for writ of habeas corpus in the California Court of Appeal.  (Lodgment 5; Doc. No. 7-85.)  At the time Petitioner filed his state habeas petition, his direct appeal was still pending.  Id. at 5–6.  Petitioner requested that his habeas petition be consolidated with his direct appeal.  (Lodgment 5; Doc. No. 7-85 at 6.)    In his habeas petition, Petitioner again claimed that his trial counsel was ineffective for failing to raise a double jeopardy bar to his prosecution for the Uribe/Leon crimes.  (Lodgment 5; Doc. No. 7-85.)

### 3. BERITAN'S DIRECT APPEAL

On July 26, 2013, Beritan filed his direct appeal in the California Court of Appeal. (Lodgment 6; Doc. No. 7-86.)  Beritan claimed that there was insufficient evidence to corroborate the accomplice testimony asserted against him, and thus his convictions for the Uribe/Leon crimes could not be sustained.  (Lodgment 6; Doc. No. 7-86 at 3.) Beritan claimed that the primary evidence of his involvement in the kidnapping and murders of Uribe and Leon came from the accomplice testimony of Moreno ("Memo"), and Pena.  (Lodgment 6; Doc. No. 7-86.)  He asserted that, apart from their accomplice testimony, there was no evidence connecting him to the Uribe/Leon crimes, and his

1   convictions must be reversed pursuant to Section 1111[14] for failure of independent

2   corroboration of the accomplice testimony.  (Lodgment 6; Doc. No. 7-86.)

3           **4.   CALIFORNIA COURT OF APPEAL RULINGS**

4               **a.   PETITIONER'S DIRECT APPEAL**

5   On July 15, 2014, in one unpublished opinion, the appellate court affirmed both

6   Petitioner's and Beritan's convictions, but modified Petitioner's judgment by ordering

7   that his sentence of life without the possibility of parole for the murder of Leon, Count

8   Seven, be set aside.  (Lodgment 10; Doc. No. 7-90 at 3, 5–6, 54.)  The appellate court

9   instead ordered a modified sentence of 25 years to life.  (Lodgment 10; Doc. No. 7-90 at

10  5–6, 54.)   The matter was remanded with directions to correct certain errors in the

11  abstracts of judgment.  (Lodgment 10; Doc. No. 7-90 at 5.)

12          In rejecting Petitioner's claim of a prosecution bar, the California Court of Appeal

13  ruled that the prohibition of multiple prosecutions did not apply when the crimes were

14  committed at different locations, at different times, against different victims, and with

15  different objectives.  (Lodgment 10; Doc. No. 7-90 at 35.)  The court ruled that because

16  Petitioner's prosecution for the Uribe/Leon crimes was not barred under the Section 654

17  prohibition of multiple prosecutions or <u>Kellett</u>, his counsel did not provide ineffective

18  assistance by failing to assert this argument in the trial court.  (Lodgment 10; Doc. No.

19  7-90 at 38.)

20          The appellate court also rejected Petitioner's claim of insufficient evidence to

21  corroborate the accomplice testimony.  (Lodgment 10; Doc. No. 7-90.)  It ruled that

22

23  ─────────────────

    [14]  California Penal Code Section 1111 reads, "A conviction can not be had upon the

24  testimony of an accomplice unless it be corroborated by such other evidence as shall

25  tend to connect the defendant with the commission of the offense; and the corroboration

    is not sufficient if it merely shows the commission of the offense or the circumstances

26  thereof.  An accomplice is hereby defined as one who is liable to prosecution for the

27  identical offense charged against the defendant on trial in the cause in which the

    testimony of the accomplice is given."  Cal. Penal Code § 1111.

28
                                        22

Petitioner's simple joinder in Beritan's claim was insufficient. (Lodgment 10; Doc. No. 7-90 at 38-39.)  The court stated that Petitioner failed to explain the claim and how he was prejudiced. (Lodgment 10; Doc. No. 7-90.)  The appellate court also rejected this claim as it pertained to Beritan. (Lodgment 10; Doc. No. 7-90 at 38.)

On September 10, 2014, in another unpublished opinion, the appellate court stated that both Petitioner and the California Attorney General agreed that while the multiple-murder special circumstance on Count 7 was stricken, a properly imposed gang-murder special circumstance applied to Count 7. (Lodgment 14; Doc. No. 7-94 at 6, 56.) Therefore, the court held that Petitioner's sentence for Count 7 remained life without the possibility of parole. (Lodgment 14; Doc. No. 7-94 at 6, 56.)

### b. PETITIONER'S STATE HABEAS PETITION

On July 15, 2014, the same day that the appellate court issued its first unpublished opinion affirming Petitioner's conviction on direct appeal, the same court issued an order denying Petitioner's state habeas petition. (Lodgment 11.)  The court noted the petition was denied "for reasons explained in [its] opinion in the direct appeal." (Lodgment 11; Doc. No. 7-91 at 2.)

### E. PROCEEDINGS IN THE CALIFORNIA SUPREME COURT

### 1. PETITIONER'S DIRECT APPEAL

In October 2014, Petitioner filed a petition for review in the California Supreme Court. (Lodgment 15; Doc. No. 7-95.)  Petitioner presented for review the question of whether his counsel rendered ineffective assistance for failing to argue that his prosecution for the Uribe/Leon crimes was barred by the prohibition against multiple prosecutions set forth in Section 654 and Kellett. (Lodgment 15; Doc. No. 7-95 at 6, 8.) Petitioner did not raise an insufficient evidence claim, nor did he make a statement of joinder in Beritan's arguments. (Lodgment 15; Doc. No. 7-95.)

23

On October 20, 2014, Beritan filed a petition for review in the California Supreme Court.  (Lodgment 16; Doc. No. 7-96.)  On November 24, 2014, the state supreme court denied both Petitioner's and Beritan's petitions for review.  (Lodgment 17.)

### 2. **PETITIONER'S STATE HABEAS PETITION**

On February 18, 2015, Petitioner's state habeas petition was denied by the California Supreme Court.  (Lodgment 19; Doc. No. 7-99 at 1.)

### IV. **STANDARD OF REVIEW**

This Petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") because it was filed after April 24, 1996, and Petitioner is in custody pursuant to the judgment of a state court. See Lindh v. Murphy, 521 U.S. 320, 336 (1997). Under AEDPA, a court may not grant a habeas petition "with respect to any claim that was adjudicated on the merits in State court proceedings," 28 U.S.C. § 2254(d), unless the state court's judgment "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).

A federal habeas court may grant relief under the "contrary to" clause "if 'the state court applies a rule that contradicts the governing law set forth in Supreme Court cases.'" Andrews v. Davis, 798 F.3d 759, 774 (9th Cir. 2015) (quoting Williams v. Taylor, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. See Bell v. Cone, 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). However, "an unreasonable application of Supreme Court precedent is not one that is merely 'incorrect or erroneous' [citation omitted],

rather, 'the pivotal question is whether the state court's application of the relevant Supreme Court precedent was <u>unreasonable</u>.'" <u>Andrews</u>, 798 F.3d at 774 (quoting <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003) and <u>Harrington v. Richter</u>, 562 U.S. 86, 101, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011)) (emphasis in original). Precedent is not "clearly established" law under Section 2254(d)(1) "unless it 'squarely addresses the issue' in the case before the state court [citation omitted] or 'establishes a legal principal that clearly extends' to the case before the state court." <u>Id.</u> at 773 (quoting <u>Wright v. Van Patten</u>, 552 U.S. 120, 125-26, 128 S.Ct. 743, 169 L.Ed.2d 583 (2008); <u>Moses v. Payne</u>, 555 F.3d 742, 754 (9th Cir. 2008)).

In deciding a habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination. Rather, Section 2254(d) "sets forth a 'highly deferential standard, which demands that state-court decisions be given the benefit of the doubt.'" <u>Id.</u> at 774 (quoting <u>Cullen v. Pinholster</u>, 563 U.S. 170, 1398, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011)). While not a complete bar on the relitigation of claims already rejected in state court proceedings, Section 2254(d) merely "'preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court precedent]' and 'goes no further.'" <u>Id.</u> (quoting <u>Richter</u>, 562 U.S. at 102).

Where there is no reasoned decision from the highest state court to which the claim was presented, the court "looks through" to the last reasoned state court decision and presumes it provides the basis for the higher court's denial of a claim or claims. <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 805−06, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991); <u>Cannedy v. Adams</u>, 706 F.3d 1148, 1156 (9th Cir. 2013), <u>as amended on denial of rehearing</u>, 733 F.3d 794 (9th Cir. 2013), <u>cert. denied</u>, − U.S. −, 134 S.Ct. 1001, 187 L.Ed.2d 863 (2014). If the dispositive state court decision does not furnish an explanation, a federal habeas court must "engage in an independent review of the record

16-CV-0101

and ascertain whether the state court's decision was objectively unreasonable." <u>Murray v. Schriro</u>, 745 F.3d 984, 996 (9th Cir. 2014).  However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim.  <u>See</u> <u>Early v. Packer</u>, 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002).  "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" the state court decision will not be "contrary to" clearly established federal law.  <u>Id.</u>  Clearly established federal law, for purposes of Section 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." <u>Andrade</u>, 538 U.S. at 72.  Ninth Circuit cases may be persuasive authority for purposes of determining whether a particular state court decision is an unreasonable application of Supreme Court law and may be relevant to determining what Supreme Court law is clearly established.  <u>See</u> <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 600 (9th Cir. 2000).

## V. <u>DISCUSSION</u>

Petitioner claims that he is entitled to habeas relief on two grounds: (1) his counsel provided ineffective assistance by failing to assert a double jeopardy bar to his prosecution for the Uribe/Leon crimes; and (2) there was no evidence to corroborate the accomplice testimony against Petitioner.  (Doc. No. 1 at 2, 13–14; 30; 38–40.)

Respondents argue that although Petitioner's first claim is exhausted, the California Court of Appeal reasonably rejected his claim.  (Doc. No. 6-1 at 6.)  They contend that Petitioner's second claim is unexhausted because he failed to raise it in the California Supreme Court.  (Doc. No. 6-1 at 6.)  Nevertheless, they assert that Petitioner's second claim must be rejected as meritless because corroboration of accomplice testimony does not involve a federal constitutional issue.  (Doc. No. 6-1 at 6.)

26

**A. CLAIM ONE: PETITIONER'S PROSECUTION FOR THE URIBE/LEON CRIMES WAS NOT BARRED BY DOUBLE JEOPARDY AND PETITIONER DID NOT RECEIVE INEFFECTIVE ASSISTANCE OF COUNSEL**

**1. PETITIONER'S PROSECUTION WAS NOT BARRED**

**a. ARGUMENTS**

Petitioner argues that it was improper for him to be prosecuted for both the Tostado crimes and the Uribe/Leon crimes because they were all part and parcel of the same course of conduct and thus, double jeopardy applied. (Doc. No. 1 at 36.) He asserts that the "similarities" between the Tostado and Uribe/Leon crimes demonstrate that they were part of the same course of conduct. (Doc. No. 1 at 13–14, 31.) In his Petition, he charts these "similarities," specifically noting: (1) the Uribe/Leon murders occurred on May 3, 2007, and the Tostado kidnapping occurred on June 8, 2007; (2) the Uribe/Leon murders were discovered on May 24, 2007, and the Tostado kidnapping was discovered on June 15, 2007; (3) Tostado was held captive at the Point Dume Court safe house, and Uribe/Leon were held captive at the Point Dume Court safe house;[15] (4) the reason for the Tostado kidnapping was ransom money and Jorge Rojas-Lopez accused Tostado of being friends of the AFO, and the reason for the Uribe/Leon murders was that Uribe owed $70,000; (5) the Los Palillos gang was affiliated with all of the crimes; and (5) the

---

[15] This information is incorrect. In the chart in his Petition, Petitioner notes that the Uribe/Leon murders occurred at the Point Dume Court safe house, just like the Tostado kidnapping. (Doc. No. 1.) However, a few pages further in his Petition, he states, "Uribe and Leon were kidnapped on May 3, 2007 and they were held captive at the <u>Garber Avenue</u> residence where they were murdered…" (Doc. No. 1 at 37) (emphasis added). Petitioner also refers to the different locations of the crimes at another point in his Petition, stating, "[a]lthough geographically separate locations were involved…" <u>Id.</u> Further, all of the evidence in the record demonstrates that Tostado was held captive at the Point Dume Court safe house, while Uribe and Leon were held captive at the Garber Avenue safe house.

modus operandi for the Tostado kidnapping was that Nancy lured him to a house where three masked men captured him.  (Doc. No. 1 at 31.)

Moreover, Petitioner asserts that the prosecution knew of the Uribe/Leon crimes when he entered into the plea agreement for the Tostado kidnapping.  (Doc. No. 1 at 36.) Petitioner contends these crimes were so similar that his co-defendant was charged with the crimes against Tostado, and evidence of the Tostado crimes was introduced during their trial.  (Doc. No. 1 at 32.)  He asserts that there was clearly a nexus between the Tostado crimes and the Uribe/Leon crimes, otherwise the prosecution "would have been hard pressed" to proceed against his co-defendant in a trial on all of these crimes.  (Doc. No. 1 at 37–38.)   Additionally, Petitioner argues that his trial counsel rendered ineffective assistance because he failed to assert the double jeopardy argument against Petitioner's prosecution for the Uribe/Leon crimes.  (Doc. No. 1 at 13, 31.)

Respondents argue that Petitioner has failed to demonstrate the same act or course of conduct played a significant part in both the Tostado kidnapping and the Uribe/Leon crimes, and thus, Petitioner has failed to show that his prosecution for the Uribe/Leon crimes was barred.  (Doc. No. 6 at 16; citing Lodgment 14 at 36, 38–39.)  They contend that the record shows the Tostado crimes and the Uribe/Leon crimes were committed at different locations, at different times, against different victims, and with different objectives.  (Doc. No. 61 at 13.)  They assert that Uribe and Leon were kidnapped in early May 2007, they were held captive at the Garber Avenue residence where they were murdered, their remains were buried in barrels at the horse ranch, and the principal motive underlying the crimes appeared to be retribution for non-payment of a $70,000 debt allegedly owed to Petitioner.  (Doc. No. 61 at 13.)  However, they argue, Tostado was kidnapped weeks after Uribe and Leon were murdered, he was held captive at a different safe house until he was rescued, and at the time of Tostado's kidnapping, the Garber Avenue residence had been abandoned.  (Doc. No. 6-1 at 16.)  They contend

Tostado was targeted because he was perceived to be an influential member of the AFO, and Tostado's kidnapping, while orchestrated by Petitioner, was facilitated by Nancy Mendoza-Moreno.  (Doc. No. 6-1 at 18; 23 RT 1267-69; 45 RT 9517-32.)

Respondents argue that it was not necessary to use the Tostado kidnapping in order to establish Petitioner's guilt for the Uribe/Leon crimes.  (Doc. No. 6-1 at 18.)  They contend that the key witnesses to each crime were different individuals, and the proof of each crime stood or fell on its own.  (Doc. No. 6-1 at 18.)  They also argue that because Petitioner pled guilty to the crimes against Tostado, as far as Petitioner was concerned, evidence of those crimes was introduced at trial solely to show motive, intent, to prove the gang allegations, and to help corroborate the accomplice testimony.  (Doc. No. 6 at 18.)

Finally, Respondents argue, Petitioner's plea agreement included only the crimes against Tostado, and did not grant him blanket immunity for all other murders and kidnappings he may have committed on behalf of Los Palillos.  (Doc. No. 6-1 at 18–19.)  They also argue that because there was no bar to his prosecution, there was also no ineffective assistance of counsel.  (Doc. No. 6-1 at 19.)

### b.  CALIFORNIA COURT OF APPEAL RULING

The California Court of Appeal rejected Petitioner's claim of ineffective assistance of counsel for failure to assert a double jeopardy bar, concluding:

> [T]he Section 654 prohibition of multiple prosecutions does not apply under the Kellett rule when "[t]he crimes were committed at different locations, at different times, against different victims, and with different objectives." (People v. Ward (1973) 30 Cal.App.3d 130, 136; see also People v. Cuevas (1996) 51 Cal.App.4th 620, 624 ["Kellett does not require, nor do the cases construing it, that offenses committed at different times and at different places must be prosecuted in a single proceeding."])

> In deciding whether the same act or course of conduct plays a significant part in more than one offense, thereby triggering application

of the Section 654 prohibition of multiple prosecutions under the <u>Kellett</u> rule, "[w]hat matters is ... the totality of the facts, examined in light of the legislative goals of [S]ections 654 and 954[] as explained in <u>Kellett</u>." (<u>People v. Flint</u> (1975) 51 Cal.App.3d 333, 336 (<u>Flint</u>)). "More specifically, if the evidence needed to prove one offense necessarily supplies proof of the other, ... the two offenses must be prosecuted together, in the interests of preventing needless harassment and waste of public funds." (<u>People v. Hurtado</u> (1977) 67 Cal.App.3d 633, 636 (<u>Hurtado</u>).)

However, in determining whether the Section 654 prohibition of multiple prosecutions applies under the <u>Kellett</u> rule, "[t]he evidentiary test of <u>Flint</u> and <u>Hurtado</u> requires more than a trivial overlap of the evidence. Simply using facts from the first prosecution in the subsequent prosecution does not trigger application of <u>Kellett</u>." (<u>Valli</u>, <u>supra</u>, 187 Cal.App.4th at p. 799.) Thus, successive prosecutions are not barred when "[d]ifferent evidentiary pictures are required ... [or] [d]ifferent witnesses would testify to the events." (<u>Ibid</u>)

…

Here, the record shows the Uribe/Leon crimes and the Tostado kidnapping were committed at different locations, at different times, against different victims, and with different objectives. The Uribe/Leon crimes and the Tostado kidnapping obviously involved different victims. Uribe and Leon were kidnapped in early May 2007, they were held captive at the Garber Avenue residence where they were murdered, and their remains were buried in barrels at the horse ranch. The principal motive underlying the crimes appeared to be retribution for nonpayment of a $70,000 debt allegedly owed to [Petitioner]. Tostado, however, was kidnapped in early June of that year, weeks after Uribe and Leon were murdered, and held captive at the Point Dume Court safe house until he was rescued. Tostado was targeted because he was perceived to be an influential member of the AFO.

Thus, viewing the evidence in the light most favorable to the prosecution, as we must *(*<u>Valli</u>, <u>supra</u>, 187 Cal.App.4th at p. 794), we conclude [Petitioner] has failed to demonstrate "the same act or course of conduct plays a significant part" *(*<u>Kellett</u>, <u>supra</u>, 63 Cal.2d at p. 827)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

in both the Tostado kidnapping and the Uribe/Leon crimes, and thus he has not established his prosecution for the Uribe/Leon crimes was barred under [S]ection 654 and the Kellett rule.

(Lodgment 10; Doc. No. 7-90 at 35–38.)

The appellate court also concluded that because Petitioner's prosecution for the Uribe/Leon crimes was not barred under Section 654 or Kellett, his counsel did not provide ineffective assistance by failing to assert this argument in the trial court. (Lodgment 10; Doc. No. 7-90 at 38.)

## c. **DISCUSSION**

This Court unequivocally agrees with the California Court of Appeal.  "The Double Jeopardy Clause of the Fifth Amendment ... provides that no person shall 'be subject for the same offence to be twice put in jeopardy of life or limb.' "  Brown v. Ohio, 432 U.S. 161, 164, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977).  The Double Jeopardy Clause protects a defendant against: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense.  Ohio v. Johnson, 467 U.S. 493, 498, 104 S.Ct. 2536, 81 L.Ed.2d 425 (1984).  Here, Petitioner's claim is predicated on the second of these three protections; he contends that jeopardy attached when the court accepted his guilty plea for the Tostado kidnapping, and thus, he could not be "tried again" for the offenses involving Uribe and Leon.  (Doc. No. 1 at 2.)

Subdivision (a) of Section 654 provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision.  An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other."  Cal. Penal Code § 654(a).  "Section 654 addresses both multiple punishment and multiple prosecution.  The separate concerns have different purposes and different rules

31

of prohibition." <u>People v. Valli</u>, 187 Cal.App.4th 786, 794 (2010). "Section 654's preclusion of multiple prosecution is separate and distinct from its preclusion of multiple punishment. The rule against multiple prosecutions is a procedural safeguard against harassment and is not necessarily related to the punishment to be imposed; double prosecution may be precluded even when double punishment is permissible." <u>Neal v. State of California</u>, 55 Cal.2d 11, 21 (1960), disapproved on other grounds in <u>People v. Correa</u>, 54 Cal.4th 331 (2012).

<u>Kellett</u> is the leading case construing Section 654's bar against multiple prosecutions. <u>Kellett v. Superior Court</u>, 63 Cal.2d 822 (1966). In <u>Kellett</u>, the California Supreme Court held that when "the prosecution is or should be aware of more than one offense in which the same act or course of conduct plays a significant part, all such offenses must be prosecuted in a single proceeding unless joinder is prohibited or severance permitted for good cause. Failure to unite all such offenses will result in a bar to subsequent prosecution of any offense omitted if the initial proceedings culminate in either acquittal or conviction and sentence." <u>Kellett</u>, 63 Cal.2d at 827, fn. omitted. The purpose of this bar is to prevent the needless harassment and waste of resources that may result from multiple prosecutions for the same act or course of conduct: "If needless harassment and the waste of public funds are to be avoided, some acts that are divisible for the purpose of punishment must be regarded as being too interrelated to permit their being prosecuted successively." <u>Id.</u>

The bar on multiple prosecutions sweeps more broadly than the prohibition on multiple punishments under Section 654: "When there is a course of conduct involving several physical acts, the actor's intent or objective and the number of victims involved, which are crucial in determining the permissible punishment, may be immaterial when successive prosecutions are attempted." <u>Kellett</u>, 63 Cal.2d at 827; <u>citing</u> <u>Neal</u>, 55 Cal.2d at 19 [whether a course of criminal conduct is divisible and therefore gives rise to more

than one act for the purposes of multiple punishments under Section 654 depends on the intent and objective of the actor].  However, "[t]he <u>Kellett</u> rule applies only where 'the prosecution is or should be aware of more than one offense in which the same act or course of conduct plays a significant part.'"  <u>Valli</u>, 187 Cal.App.4th at 796, <u>quoting</u> <u>Kellett</u>, 63 Cal.2d at 827.  The rule may apply even if multiple prosecutors act independently in charging the defendant, such that no single prosecutor is aware of the multiple prosecutions.

Appellate courts have adopted two different tests under <u>Kellett</u> to determine whether multiple offenses occurred during the same course of conduct.  <u>Valli</u>, 187 Cal.App.4th at 797.  Under one line of cases, multiple prosecutions are not barred if the offenses were committed at separate times and locations.  <u>People v. Douglas</u>, 246 Cal.App.2d 594 (1966) [no bar to multiple prosecution where each offense had a separate beginning, duration, and end, none of which overlapped]; <u>People v. Ward</u>, 30 Cal.App.3d 130, 136 (1973) [no bar to multiple prosecution where crimes were committed at different locations, at different times, against different victims, and with different objectives]; <u>People v. Cuevas</u>, 51 Cal.App.4th 620, 624 (1996) [no bar to multiple prosecution for offenses committed at different times and at different places]; <u>citing</u> <u>People v. Britt</u>, 32 Cal.4th 944, 955 (2004) [multiple prosecutions barred where registered sex offender moving from one county to another failed to notify both counties of his change in residence].  The California Court of Appeal has referred to this as the "time and place test."  <u>People v. Ochoa</u>, 248 Cal.App.4th 15, 29 (2016).

A second version of the test—the "evidentiary test"—looks to the evidence necessary to prove the offenses.  <u>Ochoa</u>, 248 Cal.App.4th at 29; <u>citing</u> <u>People v. Flint</u>, 51 Cal.App.3d 333 (1975).  "[I]f the evidence needed to prove one offense necessarily supplies proof of the other, [...] the two offenses must be prosecuted together, in the interests of preventing needless harassment and waste of public funds."  <u>People v.</u>

33

Hurtado, 67 Cal.App.3d 633, 636 (1977).  "The evidentiary test of Flint and Hurtado requires more than a trivial overlap of the evidence.  Simply using facts from the first prosecution in the subsequent prosecution does not trigger application of Kellett."  Valli, 187 Cal.App.4th at 799.

In Kellett, the leading California case interpreting the bar on multiple prosecutions in Section 654, officers were called to the scene of a disturbance and arrested the petitioner, who was standing on a public sidewalk with a pistol in his hand.  Kellett, 63 Cal.2d at 824.  The petitioner was charged in municipal court with committing the misdemeanor crime of exhibiting a firearm in a threatening manner.  Id.  After a preliminary hearing at which it appeared the petitioner had been convicted of a felony, he was charged by information in the superior court with committing the felony crime of possession of a concealable weapon by a person who had been convicted of a felony. Id.  He pled guilty to the misdemeanor charge and was sentenced.  Kellett, 63 Cal.2d at 824.  He then moved to dismiss the felony information on the ground that it was barred by Section 654.  Id.  His motion was denied, and he sought a writ of prohibition to prevent his trial on the felony charge.  Id.  The petitioner argued that exhibiting and possessing the pistol constituted a single act and thus, his felony prosecution for possession of a concealable weapon was barred by his misdemeanor conviction for exhibiting a firearm in a threatening manner.  Id.

The Kellett court determined that, "[i]f only a single act or an indivisible course of criminal conduct is charged as the basis for a conviction, the defendant can be punished only once although he may have violated more than one statute."  Kellett, 63 Cal.2d at 824.  The court further explained, "[w]hether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of [S]ection 654 depends on the intent and objective of the actor."  Kellett, 63 Cal.2d at 824–825.  The court held, "[w]hen, as here, the prosecution is or should be aware of more than one

34

offense in which the same act or course of conduct plays a significant part, all such offenses must be prosecuted in a single proceeding unless joinder is prohibited or severance permitted for good cause.  Failure to unite all such offenses will result in a bar to subsequent prosecution of any offense omitted if the initial proceedings culminate in either acquittal or conviction and sentence."  Id. at 827.

Petitioner's case is clearly distinguishable from the situation in Kellett.  Petitioner likens his situation to that of the petitioner in Kellett, who was charged with two separate crimes for one act – standing on a public sidewalk with a pistol in his hand.  However, the facts of the Kellett case are in stark contrast to the facts surrounding Petitioner's crimes.  Petitioner's crimes against Tostado, Uribe, and Leon did not arise out of the same act or course of conduct.  Rather, as the appellate court explained when affirming Petitioner's conviction, the Tostado and Uribe/Leon crimes were committed at different locations, at different times, against different victims, and with different objectives. (Lodgment 10; Doc. No. 7-90 at 37.)  Petitioner has failed to demonstrate that the same act or course of conduct played a significant part in both sets of crimes.

Petitioner cites several cases to support his argument that the Tostado crimes and the Uribe/Leon crimes were part of the same course of conduct, and therefore, his prosecution was barred.  First, he cites People v. Britt, 32 Cal.4th 944 (2004).  (Doc. No. 1 at 36-37.)  In that case, the defendant was a sex offender who moved from Sacramento, California to El Dorado, California, and failed to notify law enforcement authorities in either county that he had relocated.  Id. at 949.  The defendant pled no contest to failure to register in Sacramento, and was then prosecuted and found guilty for the same act – his unreported move – in El Dorado.  Id. at 949–950.  The California Supreme Court reversed the defendant's El Dorado conviction, holding "the same act or course of conduct – a single unreported move within California – played a significant role in both omissions."  Id. at 954.

16-CV-0101

Britt is distinguishable from Petitioner's case.  As Petitioner notes in his argument, the Britt case involved "but a single course of conduct – one unreported move."  (Doc. No. 1 at 36–37.)  That is certainly not the case here, where Petitioner was involved in two separate kidnapping incidents in two different months, the crimes were committed for two different reasons, and there were two very different outcomes.  Further, the victims were kidnapped from two different places, held captive at two different locations for different lengths of time, and were lured into captivity under two different sets of circumstances.  Analogizing Petitioner's crimes to the single unreported move in Britt only accentuates the fact that Petitioner's crimes against Tostado and Uribe/Leon were not at all part of the same act or course of conduct.

Petitioner also cites United States v. Patterson, 381 F.3d 859 (9th Cir. 2004) to support his argument.  Once again, Petitioner's citation is not on point.  In Patterson, the defendant was indicted on one count of knowingly and intentionally manufacturing 100 or more marijuana plants.  Id. at 861.  He entered into a plea agreement in which he agreed to plead guilty to manufacturing marijuana, and the plea agreement stated the number of marijuana plants was in dispute and would be litigated at sentencing.  Id. Subsequently, the United States Supreme Court decided Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).  The district court then determined that the plea was invalid under Apprendi because the defendant did not stipulate to the number of marijuana plants.  Id. at 862.  The court vacated the defendant's guilty plea, and a jury found him guilty of manufacturing 100 or more marijuana plants.  Id.  On appeal, the Ninth Circuit agreed with the defendant and held that jeopardy attached when the court accepted his guilty plea.  Id. at 863.

Like Britt, Patterson is clearly distinguishable from the instant case.  In Patterson, the guilty plea and the trial involved the same act – manufacturing marijuana.  The only difference was that the number of marijuana plants was not specified in the defendant's

36

plea agreement.  Here, Petitioner pled guilty only to the crimes against Tostado.  As Respondents argue, pleading guilty to the kidnapping of Tostado did not grant Petitioner blanket immunity to commit additional kidnappings, and murders, for the benefit of Los Palillos.  The scenario presented in Patterson, and the scenario presented here, are clearly not analogous.  Therefore, the Patterson analysis is not applicable to Petitioner's case.

Finally, Petitioner cites U.S. v. McIntosh, 580 F. 3d 1222 (11th Cir. 2009), another case that is not on point.  (Doc. No. 1 at 35.)  The defendant in McIntosh pled guilty to an indictment that alleged drug and firearm charges, and the district court unconditionally accepted his plea.  McIntosh, 580 F. 3d at 1224.  Before sentencing, the government discovered the indictment alleged the wrong date of the offenses, obtained a second indictment with the correct date of the offenses, and filed a motion to dismiss the first indictment.  Id.  The district court granted the motion.  Id.  The Eleventh Circuit concluded therefore, when the defendant pled guilty to the first indictment, jeopardy attached, and the second indictment for the same offenses violated the Double Jeopardy Clause.  Id.  The appellate court held that the district court erred when it denied the defendant's motion to dismiss the second indictment.  Id. at 1224–1225.

Like the other cases that Petitioner cites, McIntosh is distinguishable.  In McIntosh, both indictments charged the defendant with the same crimes arising from the same acts; there was simply an incorrect date alleged in the first indictment.  After the court accepted his unconditional guilty plea to the charges in the first indictment, the appellate court held that the second indictment for the same exact crimes had to be dismissed.  Here, Petitioner complains that, like the defendant in McIntosh, he was charged with the same crimes for which he had previously pled guilty.  Petitioner's argument is without merit.  As previously discussed, Petitioner entered a guilty plea for kidnapping Tostado in June 2007.  Tostado was held captive at the Point Dume Court safe house, and rescued by the FBI.  Petitioner's jury trial was for completely different crimes, against

37

16-CV-0101

completely different victims, under completely different circumstances. Petitioner did not plead guilty to any murders. A jury then found him guilty of murdering both Uribe and Leon. Petitioner's argument that he was immune to any prosecution for the murders of different victims because he pled guilty to kidnapping an entirely separate victim who was eventually rescued by the FBI, is simply absurd. His argument defies any rational purpose for Section 654, interpretation of <u>Kellett</u>, spirit of the Double Jeopardy Clause, and common sense.

While none of the cases cited by Petitioner are on point, the Court finds the cases described below to be instructive. In <u>People v. Ward</u>, the question presented on appeal was whether the several felonies committed by the defendant against two victims were so closely related that the prosecution and conviction of the defendant for one of the felonies barred the subsequent prosecution of the defendant for the remaining felonies. <u>People v. Ward</u>, 30 Cal. App. 3d 130, 132 (1973). The defendant pled guilty to a charge of sex perversion in San Bernardino County, California, and was subsequently convicted in Los Angeles County, California on a charge of kidnapping the mother of the victim of the sex perversion offense. <u>Id.</u> at 133. The defendant contended that all of the offenses arose out of a single course of conduct, occurred at approximately the same time, were of the same class of crime, and were each committed in defendant's automobile. <u>Id.</u> at 133–134. He moved to dismiss the Los Angeles complaint on the ground that it was barred by the failure of the prosecution to join all offenses in a single proceeding pursuant to Section 654. <u>Id.</u> His motion was denied. <u>Id.</u> at 133. The California Court of Appeal affirmed the second conviction, holding that the proscription against multiple prosecutions in Section 654 was not applicable because San Bernardino County did not have jurisdiction to try the defendant for all of the offenses charged in the Los Angeles prosecution. <u>Ward</u>, 30 Cal. App. 3d at 135–136. The court further held that even if all charges could have been properly joined in San Bernardino County, the

mandatory joinder provisions of Section 654 were not applicable because the defendant's acts did not amount to a continuous course of conduct.[16]

In People v. Douglas, the defendant committed a series of robberies and assaults. People v. Douglas, 246 Cal. App. 2d 594 (1966). When officers tried to arrest the defendant and his accomplice for those offenses, gunfire broke out and an officer was killed. Id. at 595–596. The defendant was indicted, and later acquitted, for the murder of the officer. Id. at 596. After his acquittal, the defendant was charged with and convicted of the robberies and assaults. Id. In the robberies/assaults trial, counsel stipulated that the transcript of certain testimony in the earlier murder trial concerning the robberies could be introduced as substantive evidence. Id. Both sides presented additional evidence concerning the robberies. Id. The California Court of Appeal, holding that double jeopardy was not violated and affirming the defendant's judgment, stated:

> [D]efendants were prosecuted for unrelated offenses arising from separate physical acts performed at different times. A murder, a robbery, an assault, like every other action, normally has a beginning, a duration, and an end, and where, as here, none of these overlap, simultaneous prosecution is not required under any present theory of jurisprudence. The offenses found too closely related in Kellett to be prosecuted separately arose at the same moment in time and were based on a single act–brandishing a pistol–whence came both the charge of exhibiting a firearm in a threatening manner and the charge of possession of a concealable weapon by a felon.
>
> While a defendant may not be subjected to a series of trials in an effort to wear him down, harass him, or obtain an acceptably severe judgment, we see no reason to require prosecutors to proceed against a defendant

---

[16] The appellate court also affirmed the second conviction of the basis that Section 654 did not apply to successive felony prosecutions in different jurisdictions under circumstances where there was a substantial risk that the felon might escape proper punishment. Ward, 30 Cal. App. 3d at 136–137.

simultaneously for all known offenses, whether related to one another or not, in order to guard against the possibility of harassment. The adoption of such a rule would tend to aggravate the very harassment it was designed to alleviate by impelling a prosecutor filing on one charge to throw the book at the defendant in order to prevent him from acquiring immunity against other potential charges and to protect the prosecutor from accusations of neglect of duty. Such a rule would radically alter the provisions now governing permissive joinder of offenses in a single accusatory pleading, by compelling an indiscriminate joinder of all offenses, an alteration which would be wholly inconsistent with our present joinder statute. We adhere to the view that the time for the initiation of prosecutions is governed by the general statute of limitations, that the defendants have no legal cause to complain because they were first prosecuted for murder and later prosecuted for robberies and assaults which took place prior to the time of the murder. While the defendants have a constitutional right to a speedy trial, they have no general right to a prosecution speedier than that laid down by the statute of limitations.

Douglas, 246 Cal. App. 2d at 599 (internal citations omitted).

In People v. Cuevas, the defendant, relying on Kellett, argued that his prosecution for cocaine sales on two separate dates was barred by the prosecution's failure to charge those offenses in an earlier prosecution for possession of cocaine for sale. People v. Cuevas, 51 Cal. App. 4th 620, 621 (1996). The California Court of Appeal stated that the essence of the defendant's argument was that the authorities knew about all of her narcotic offenses and could have charged them all in a single proceeding, and by charging her with only one offense, they could not charge her with the other offenses in a second proceeding. Id. at 623. Denying the defendant's habeas petition, the appellate court explained that "Kellett does not require, nor do the cases construing it, that offenses committed at different times and at different places must be prosecuted in a single proceeding." Id. at 624.

40

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Here, the appellate court determined Petitioner failed to meet his burden of showing that Section 654 barred his prosecution under the <u>Kellett</u> rule for the Uribe/Leon crimes following his conviction for aiding and abetting the Tostado kidnapping. (Lodgment 10; Doc. No. 7-90 at 37.)   As previously discussed, the Section 654 prohibition of multiple prosecutions does not apply when "[t]he crimes were committed at different locations, at different times, against different victims, and with different objectives." (Lodgment 10; Doc. No. 7-90 at 37; citing <u>People v. Ward</u>, 30 Cal.App.3d at 136.)  The Double Jeopardy Clause protects a defendant against a second prosecution for the same offense after conviction.  The record makes clear that Petitioner was not prosecuted for the same offense after his conviction for the Tostado crimes.  Rather, the record demonstrates that the Tostado kidnapping and the Uribe/Leon crimes were committed at different locations, at different times, against different victims, and with different objectives.  (Lodgment 10; Doc. No. 7-90 at 37.)  Tostado, kidnapped after Uribe and Leon had already been murdered, was held captive at a different location than Uribe and Leon, and was rescued by the FBI, whereas Uribe and Leon were killed and their remains were buried in barrels on a horse ranch near the United States border with Mexico.  Evidence in the record shows that Tostado was kidnapped because he was perceived to be an influential member of the AFO, while Uribe was kidnapped for retribution for non-payment of a debt allegedly owed to Petitioner, and Leon appeared to be at the wrong place at the wrong time.

This Court finds that Petitioner failed to demonstrate that the same act or course of conduct played a significant part in the Tostado kidnapping and the Uribe/Leon crimes, and thus, Petitioner has failed to establish that his prosecution for the Uribe/Leon crimes was barred by double jeopardy.  Therefore, the Court **RECOMMENDS** that Petitioner's Petition for Writ of Habeas Corpus as to the double jeopardy claim be **DENIED**.

41

## 2. **PETITIONER'S COUNSEL WAS NOT INEFFECTIVE**

The clearly established United States Supreme Court law governing ineffective assistance of counsel claims is <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); <u>see</u> <u>Baylor v. Estelle</u>, 94 F.3d 1321, 1323 (9th Cir. 1996).  The Supreme Court has explained the <u>Strickland</u> inquiry as follows:

> To establish deficient performance, a person challenging a conviction must show that counsel's representation fell below an objective standard of reasonableness.  A court considering a claim of ineffective assistance must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance.  The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment.

> With respect to prejudice, a challenger must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

<u>Harrington v. Richter</u>, 562 U.S. 86, 104, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) (internal citations and quotation marks omitted).  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  <u>Strickland</u>, 466 U.S. at 686.  The likelihood of a different outcome must be "substantial," not merely "conceivable," <u>Richter</u>, 131 S.Ct. at 792, and when <u>Strickland</u> and AEDPA operate "in tandem," as here, the review must be "doubly" deferential, <u>id.</u> at 788; <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123, 129 S.Ct. 1411, 173 L.Ed.2d 251 (2009).  "When [Section] 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied <u>Strickland's</u> deferential standard."  <u>Richter</u>, 131 S.Ct. at 788.

Here, in the last reasoned state court decision, the California Court of Appeal denied Petitioner's ineffective assistance of counsel claim, reasoning that because Petitioner's prosecution for the Uribe/Leon crimes was not barred under the Section 654 prohibition of multiple prosecutions, his counsel did not provide ineffective assistance by failing to assert in the trial court that Section 654 barred his prosecution for those crimes.  (Doc. No. 7-94 at 39.)

This Court again unequivocally agrees with the reasoning of the California Court of Appeal.  Petitioner has not established that counsel's failure to object resulted in prejudice under Strickland such that there is reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, or that the Court's confidence in the outcome is undermined.  Strickland, 466 U.S. at 694; Fretwell, 506 U.S. at 372.  As discussed above, Petitioner's involvement in the Tostado kidnapping and Uribe/Leon murders was not part of the same act or course of conduct, and therefore, Petitioner's prosecution and subsequent conviction of the Uribe/Leon crimes was not barred by Section 654 or the Double Jeopardy clause of the Fifth Amendment.  Any objection by Petitioner's counsel would have been futile.

Petitioner has failed to show either deficient performance or prejudice.  The state appellate court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law, nor was it based on an unreasonable determination of the facts.  Williams v. Taylor, 529 U.S. 362, 412-13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); 28 U.S.C. § 2254(d)(2).  Petitioner is not entitled to relief as to claim one.  Therefore, the Court **RECOMMENDS** that Petitioner's Petition for Writ of Habeas Corpus as to the ineffective assistance of counsel claim be **DENIED**.

16-CV-0101

## B. CLAIM TWO: PETITIONER'S CLAIM OF INSUFFICIENT EVIDENCE TO COOROBORATE THE ACCOMPLICE TESTIMONY FAILS

### 1. ARGUMENTS

In claim two, Petitioner asserts that there was insufficient evidence, apart from the accomplice testimony of Moreno and Pena, to connect him to the commission of the kidnappings and murders of Uribe and Leon.  (Doc. No. 1 at 38.)  He asserts that his conviction is in violation of Section 1111 of the California Penal Code, which prohibits a conviction based upon the testimony of an accomplice unless it is corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense.  (Doc. No. 1 at 38; Cal. Penal Code § 1111.)

Petitioner argues that there was no witness, apart from Moreno and Pena, who identified him or testified that he had any specific role in the commission of the crimes committed against Uribe and Leon.  (Doc. No. 1 at 39.)  He claims there was nothing even circumstantially suggestive to show that he had a role in those crimes.  (Doc. No. 1 at 39.)  Curiously, in his Petition, he also concedes that, "the prosecution's case was based in part on the accomplice testimony of both Moreno and Pena."  (Doc. No. 1 at 39)(emphasis added).

Respondents contend that Petitioner's claim should be denied because it is unexhausted, and it has no merit as there is no constitutional requirement that accomplice testimony be corroborated.  (Doc. No. 6 at 2.)

16-CV-0101

## 2. CALIFORNIA COURT OF APPEAL RULING

The California Court of Appeal briefly addressed Petitioner's claim of insufficient evidence to corroborate the accomplice testimony, stating,

> In his appellant's opening brief, which he filed before Beritan filed his, [Petitioner] attempts to join in Beritan's arguments by summarily stating he "joins in any arguments raised by [Beritan] which may accrue to [Petitioner's] benefit." Joinder is broadly permitted (Cal. Rules of Court, [R]ule 8.200(a)(5)), "but each appellant has the burden of demonstrating error and prejudice." (People v. Nero (2010) 181 Cal.App.4th 504, 510, fn. 11; Paterno v. State a/California (1999) 74 Cal.App.4th 68, 106 ["Because of the need to consider the particulars of the given case, rather than the type of error, the appellant bears the duty of spelling out in his brief exactly how the error caused a miscarriage of justice."].) Here, [Petitioner] did not supply any argument on the issue of accomplice testimony corroboration as it applies to his unique circumstances. To the extent [Petitioner's] cursory joinder is an attempt to challenge the sufficiency of the evidence corroborating the accomplice testimony of Moreno and Pena as that testimony pertains to him, his reliance solely on Beritan's arguments and reasoning is insufficient to satisfy his burden on appeal. (See Nero, at p. 510, fn. 11.) Accordingly, we consider this issue only as to Beritan.

(Lodgment 10; Doc. No. 7-90 at 38-39, n. 8.)

## 3. DISCUSSION

### a. PETITIONER'S CLAIM IS UNEXHAUSTED

The first issue is whether Petitioner's claim is exhausted. Petitioners for writs of habeas corpus who wish to challenge either their state court conviction or the length of their confinement in state prison must first exhaust state judicial remedies. 28 U.S.C. § 2254(b), (c); Granberry v. Greer, 481 U.S. 129, 133-34 (1987). To exhaust state judicial remedies, a California state prisoner must present the California Supreme Court with a fair opportunity to rule on the merits of every issue raised in his or her federal habeas petition. 28 U.S.C. § 2254(b), (c); Granberry, 481 U.S. at 133–34. Moreover, to

45

properly exhaust state court remedies a petitioner must allege, in state court, how one or more of his or her federal rights have been violated.  The Supreme Court in Duncan v. Henry, 513 U.S. 364 (1995) reasoned: "If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution."  Id. at 365–366.  For example, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him [or her] the due process of law guaranteed by the Fourteenth Amendment, he [or she] must say so, not only in federal court, but in state court."  Id. at 366 (emphasis added).

"The burden of proving that a claim has been exhausted lies with the petitioner." Matthews v. Evatt, 105 F.3d 907, 911 (4th Cir. 1997); see Breard v. Pruett, 134 F.3d 615, 619 (4th Cir. 1998); Lambert v. Blackwell, 134 F.3d 506, 513 (3d Cir. 1997); Oyler v. Allenbrand, 23 F.3d 292, 300 (10th Cir. 1994); Rust v. Zent, 17 F.3d 155, 160 (6th Cir. 1994).  Here, Petitioner checked the "yes" box in his Petition form under the question, "Did you raise ground Two in the California Supreme Court." (Doc. No. 1 at 7.) Petitioner does not provide any information as to the nature of the proceeding, case number or citation, or the result.  Id.  Other than that checked box, Petitioner is silent as to whether or not he brought this claim to the California Supreme Court.  See Doc. No. 1.  Respondents argue that Petitioner did not raise this claim in the California Supreme Court.  (Doc. No. 6-1 at 20.)  There is no evidence in the record that Petitioner has presented this claim to the state's highest court.  Therefore, the Court finds that Petitioner's claim is unexhausted.

Further, under the AEDPA a one-year period of limitation shall apply to a petition for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of:

16-CV-0101

(A) the date of which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1)(A)-(D).

The statute of limitations does not run while a properly filed <u>state</u> habeas corpus petition is pending.  28 U.S.C. § 2244(d)(2); <u>see</u> <u>Nino v. Galaza</u>, 183 F.3d 1003, 1006 (9th Cir. 1999).  <u>But see</u> <u>Artuz v. Bennett</u>, 531 U.S. 4, 8 (2000) (holding that "an application is 'properly filed' when its delivery and acceptance [by the appropriate court officer for placement into the record] are in compliance with the applicable laws and rules governing filings.").  However, absent some other basis for tolling, the statute of limitations does run while a <u>federal</u> habeas petition is pending.  <u>Duncan v. Walker</u>, 533 U.S. 167, 181-81 (2001).

On September 10, 2014, the California Court of Appeal denied Petitioner's and Beritan's direct appeals.  (Lodgment 14.)  Petitioner did not raise the insufficient evidence claim in his petition for review to the California Court of Appeal, nor did he raise this claim in his state habeas petition.  On February 17, 2016, this Court issued a Notice Regarding Possible Failure to Exhaust and One-Year Statute of Limitations. (Doc. No. 2.)  In its Notice, the Court cautioned Petitioner that the AEDPA a one-year

47

1  period of limitation shall apply to a petition for a writ of habeas corpus by a person in

2  custody pursuant to the judgment of a State court.  Id. at 2.  Here, it appears clear from

3  the Petition, Respondent's Motion, and the lodgments attached thereto, that Petitioner

4  has not exhausted his state court remedies and that the time period to do so has expired.

5  Petitioner's claim must be denied on this basis.

**b.  <u>PETITIONER FAILS TO PRESENT A COGNIZABLE CLAIM</u>**
6
**<u>FOR FEDERAL HABEAS REVIEW</u>**
7

8      Although Petitioner has not exhausted this claim in state court, and thus, his Petition

9  should be denied on that basis, the Court will briefly address the second issue, which is

10 whether a federal court may adjudicate a state law habeas corpus claim on the merits.

11 Under California law, "A conviction can not be had upon the testimony of an accomplice

12 unless it be corroborated by such other evidence as shall tend to connect the defendant

13 with the commission of the offense . . ."  Cal. Penal Code § 1111.  "The corroborating

14 evidence may be circumstantial or slight and entitled to little consideration when

15 standing alone, and it must tend to implicate the defendant by relating to an act that is an

16 element of the crime.  The corroborating evidence need not by itself establish every

17 element of the crime, but it must, without aid from the accomplice's testimony, tend to

18 connect the defendant with the crime."  <u>People v. McDermott</u>, 51 P.3d 874, 899 (Cal.

19 2002).  Nevertheless, it is well-settled in this Circuit that the corroboration of an

20 accomplice's testimony is not mandated by federal law unless such testimony is

21 "incredible or unsubstantial on its face."  <u>Laboa v. Calderon</u>, 224 F.3d 972, 979 (9th Cir.

22 2000) (quoting <u>U.S. v. Necoechea</u>, 986 F.2d 1273, 1282 (9th Cir. 1993)); <u>U.S. v. Lopez</u>,

23 803 F.2d 969, 973 (9th Cir. 1986); <u>United States v. Lai</u>, 944 F.2d 1434, 1440 (9th

24 Cir.1991).

25     Because Moreno and Pena's testimony was neither incredible nor insubstantial on

26 its face, and because Section 1111 is a state rule, habeas will lie for Petitioner only if the

27

28

48

alleged violation of Section 1111 denied Petitioner his due process right to fundamental fairness.  See Estelle v. McGuire, 502 U.S. 62, 72–73, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).  A state violates a criminal defendant's due process right to fundamental fairness if it arbitrarily deprives the defendant of a state law entitlement.  See Hicks v. Oklahoma, 447 U.S. 343, 346, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980).  No such arbitrary denial occurred here.  The jury was presented with sufficient evidence at trial to connect Petitioner with the crimes against Uribe and Leon, without aid from the testimony of Moreno and Pena.

Veronica Gamez, Uribe's wife,[17] testified at Petitioner's trial.  She testified that she and Uribe met Petitioner in late 1999 and they all became close friends.  She testified that Petitioner and his brother joined Uribe in the marijuana–trafficking business, but the business relationship ended in 2004.  She testified that Petitioner and Uribe remained friends for awhile, but their friendship ended in March 2007 due to an argument related to drug trafficking.  Gamez testified that on May 3, 2007, shortly before 8:30 a.m., Gonzalez telephoned Uribe when Uribe was about to leave the house with Leon.  Adrian asked Uribe whether he owed Petitioner money.  She testified that Uribe became very angry, cursed, denied that he owed money to Petitioner, said that Petitioner was lying, and told Adrian he did not know what Adrian was talking about.  She testified that Petitioner then called Uribe, also before Uribe and Leon left the house that morning, and told Uribe they needed to talk.  She testified that Uribe told Petitioner he was on his way out and would call back as soon as he was in the car.  Later that day, Gamez learned that Uribe had been kidnapped.

Adrian Gonzalez also testified at Petitioner's trial.  Petitioner rented his home from Gonzalez.  Gonzalez testified that in May 2007, the month that Uribe and Leon were

---

[17] Although they never married, Gamez thought of Uribe and referred to him as her husband.  (R.T. Vol. 25 4530–4532.)

kidnapped, Petitioner was two months behind on his rent.  When Gonzalez attempted to collect the past due rent, Petitioner told Gonzalez that Uribe owed Petitioner $70,000. He told Gonzalez that he would pay the past due rent when he received the money from Uribe.

Tostado also testified at Petitioner's trial.  He testified that he and Petitioner had been friends, but they had a falling out in 2003 or 2004 and they stopped communicating with one another.  Around the same time period that Tostado feared that he might be the potential victim of a kidnapping, a mutual friend of Tostado and Petitioner's told Tostado that Petitioner was trying to reach Tostado.  Tostado testified that, on June 8, 2007, when Tostado and Petitioner met at a Starbucks for coffee, Petitioner introduced him to an attractive woman named Nancy who then lured him to the Point Dume Court safe house where he was grabbed, struck in the face and stomach with a rifle, hit was a Taser, cuffed at his legs and hands, and blindfolded.

Petitioner has failed to show that he exhausted his state judicial remedies for this claim.  Further, Petitioner's claimed violation of Section 1111 is a state rule, and thus, he is only entitled to habeas relief on this claim if the alleged violation of Section 1111 denied Petitioner his due process right to fundamental fairness.  As explained above, there was evidence presented at trial to connect Petitioner with the crimes against Uribe and Leon, without aid from the testimony of Moreno and Pena.  Petitioner's due process right to fundamental fairness was not violated.  Petitioner is not entitled to relief as to claim two.  Therefore, the Court **RECOMMENDS** that Petitioner's Petition for Writ of Habeas Corpus be **DENIED** as to claim two.

16-CV-0101

## IV. <u>RECOMMENDATION</u>

For the For the aforementioned reasons, the Court **RECOMMENDS** Petitioner's Petition for Writ of Habeas Corpus be **DENIED** with prejudice. This Report and Recommendation is submitted to the United States District Judge, pursuant to the provision of 28 U.S.C. Section 636(b)(1).

**IT IS ORDERED** that no later than <u>**September 21, 2016**</u>, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than <u>**October 5, 2016**</u>. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED.**

Dated:  August 31, 2016

Hon. William V. Gallo
United States Magistrate Judge

51

16-CV-0101